# Jefferson County Bank v. Insurance Co. of State of Pennsylvania.

(Decided Dec. 1, 1933.)

J. S. LUSCHER and BENJ. F. GARDNER for appellant.

WOODWARD, HAMILTON & HOBSON for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

The Jefferson County Bank (hereinafter called the bank), as appointee for payment under a policy of fire insurance, issued by the appellee to the Continental Lumber and Manufacturing Company (hereinafter called the lumber company), sued thereon; it was unsuccessful and has appealed.

The policy issued July 26, 1929, insured the lumber company against fire as follows:

"$3,000.00 on lumber * * * and other timber products * * * all only while on lumber yard, situated Nos. 2126-2138 South Floyd Street; also in cars on the premises above described or within 100 feet thereof, City of Louisville Jefferson County, State of Kentucky. Other insurance permitted.

"Clear Space Clause. It is made a condition of this insurance that a continuous clear space of not less than ——— feet shall at all times hereafter be maintained between the property herein described and any wood-working or manufacturing establishment, or dry kiln."

In the building that housed its manufacturing plant the lumber company had quite a bit of lumber which we shall refer to as the lumber in the mill, and on its yard it had other lumber which we shall refer to as the lumber on the open yard.

In July, 1929, the lumber company needed money to pay for green lumber which it had purchased and which was then being received and stacked by it on its open yard. It made its note to the bank on July 22, 1929, for $1,000, but the bank refused to give it credit therefor until it should procure additional fire insurance.

Another policy for $3,500 on lumber and $1,000 on machinery issued by the National Union Company contained these clauses:

"Permission granted to operate at night later than ten (10) o'clock P. M."

"Permission granted for use of the premises as is usual and incidental in the business, as conducted therein, of lumber yard and molding shop and to keep and use all articles and materials used and incidental to said business, in such quantities as the exigencies of the business require."

The policy issued by appellee contained no such provision. The effect of these permissions would be to indicate the National Union was consciously insuring lumber within as well as lumber without the mill, while appellee was endeavoring to restrict its contract to lumber outside the mill; that is, to lumber on the open yard.

This $3,000 policy was mailed by appellee's agent on July 26, 1929, direct to the bank, and it accepted the $1,000 note of the lumber company and gave it credit therefor on July 27, 1929. It is clear from the evidence that the lumber company regarded the National Union policy as covering the machinery and the lumber in the mill and the appellee's policy as covering the lumber on the open yard only.

On September 3, 1929, the mill and the lumber therein were destroyed by fire. The lumber on the open yard was not injured in the least. On October 14, 1929, the lumber company was adjudged bankrupt.

On October 16, 1929, the insurance under the Na-

tional Union policy was adjusted. The sound value of the lumber in the mill was agreed to be $7,200 and that it was destroyed. The sound value of the lumber on the open yard was agreed to be $1,339.97 and that it was uninjured. Adding these two, there was $8,539.97 worth of lumber insured by the National Union Company, and, of this, $7,200 worth was destroyed. It was agreed the coinsurance clause was inoperative the loss having been so great, and that the pro rata clause should be applied; the loss of lumber insured under this policy was then agreed to be 7,200.00/8,539.97 of $3,500, or $2,950.83, and a settlement with the National Union was made on that basis.

We have just stated how the National Union insurance was settled, from which we see no coinsurance was claimed, and in the deposition of Mr. Harrison who made this adjustment we find this:

"At the time I asked Mr. Patton if there was any other insurance which is, of course, a very important feature in adjustments. He stated that there was not any other insurance covering on the property involved. This was then entered in the proof of loss, the proof of loss completed and Mr. Patton signed it."

Mr. Patton was the president of the lumber company, and in the proof of loss, which he signed and swore to, we find this:

"The total amount of insurance upon the property covered by this policy was, at the time of the fire, $4,500.00, as more particularly specified in the apportionment attached under Schedule C, besides which there was no policy or other contract of insurance, written or oral, valid or invalid."

Mr. Leichhardt, president of the bank, was present at this settlement, and was interested therein and assisted in its making. This certainly shows that all of them understood the policy sued on did not cover the lumber in the mill, and so treated it, on October 16th.

Thereafter, on October 29th, the lumber company wrote the agents of the appellee this letter:

"We have your registered letter and notice the cancellation of our policy in the State of Penn. Philadelphia, Penn. Since you have taken the position

of the cancellation we desire to notify you of your liability which was in existence on Sept. 3rd. when we had our fire here in our yard and factory entailing a loss of some $20,000.00. Your policy covers this according to the National Union Fire Insurance Co., of Pittsburg, Penn., who refuses to pay unless this can be settled, they claim co-insurance. We have referred the same to the insurance Commissioner at Frankfort. We would like for you to get busy immediately and settle with the Jefferson County Bank, Jeffersontown, Ky. as they are the holder of this policy.''

On February 19, 1930, the bank sued appellee on this policy, and made Lee L. Simons the trustee in bankruptcy of the lumber company, a defendant. In due time Simons filed an answer and cross-petition, and he too is seeking to recover on appellee's policy.

Appellee answered, denied that there had been a loss of any lumber or timber products while stored on the yard of the lumber company, and further sought to have the contract of insurance so reformed as to cover only the lumber on the open yard, and the cause was transferred to equity, and the court so reformed the policy and dismissed the petition.

Since we have concluded the policy as issued did not cover the lumber in the mill, we shall not go into the reasoning by which the trial court reached the conclusion the policy should be so reformed as to cover only the lumber in the open yard.

This insurance covered lumber and timber products of the lumber company only while on the lumber yard, Nos. 2126-2138 South Floyd street. The proof shows that this green lumber was situated on the east end of these lots next to South Floyd street. The mill was situated at some point west of this green lumber, and it was the lumber in the mill that was destroyed. To be entitled to recover, the bank and the trustee in bankruptcy would have to show this destroyed lumber was on this lumber yard, as that had been put in issue by the answer. There is no proof this mill was situated on the lots that bore the numbers 2126 to 2138 at all, but, granting that it was so situated, would the average reasonable man regard the term ''lumber yard'' as including a mill even though it be adjacent thereto. We

think not. In saying this we have not overlooked the case of American Insurance Co. v. Meyers, 118 Ill. App. 484, where the question was, What was meant by the expression "In their yard"?

Meyers et al. were in the lumber business; they had some dressed lumber which was stacked under an open sided shed to protect it from the weather, and they had some rough lumber outside of the shed. The policy covered "lumber, laths, shingles and posts contained in their yard." Fire destroyed some of the lumber in the shed and some outside the shed. The insurance company denied liability for the loss of the lumber in the shed, but the court held, and we think rightly, that the policy covered the lumber in the shed. Meyers et al. had some lumber that required protection from the weather, some that did not, but it was all one business activity, and was all in their yard—that is, inclosed within the boundaries of their yard—and the lumber under a shed was as much within their yard as the lumber that was not under the shed.

In this case the lumber company, in a sense, had two business activities. It had a yard on which it stacked its green lumber while it was seasoning, which was one, and it had a mill in which it dressed and cut this lumber after it was seasoned, and in which it kept it after it was dressed until it was sold and shipped away, which was another. It had green lumber stacked on its open yard, and it had dressed and finished lumber stacked in its mill. It was the receipt of this green lumber that caused the lumber company to have to borrow money; it was the borrowing of this money that caused it to have to take this insurance; it was this green lumber that was shown to the insurance agent by Mr. Patton, the president of the lumber company; and Patton was told by the agent that there was not $3,000 worth of lumber on the yard. It is quite significant that, when this was told him, Patton said nothing of the lumber in the mill, but said he had two more cars of green lumber coming in. The agent told him he would not insure the lumber in the mill, and he replied he had "insurance on the building—on the contents of the building." The agent told Patton the insurance would be written, but he would have to maintain a clear space of 35 feet between the green lumber and the mill and a space of 40 feet between this green lumber and a ware-

house on some adjoining property, and Patton agreed to this, and assured the agent he would keep it clean, and, when the agent next inspected the premises, it was clean, that he visited the premises after the fire and Patton took him out in the yard and showed him the lumber he had insured, that it was not even scorched and told him there would be no claim against his company, and that he wished the policy had been taken out to cover the lumber in the mill. On cross-examination this witness stated the rate charged was 78.4 cents per hundred and that the same rate applied to the lumber in the mill; that being the only published lumber rate.

The appellants are objecting to this agent's evidence because, as they say, Patton the president of the Lumber Company, was dead when it was given, but, if there were any merit in that objection, they have waived it by filing no exceptions to the deposition as required by section 587 of the Civil Code of Practice.

Mr. Leichhardt, who handled this matter for the bank, testified that Patton told him "The insurance was on the lumber there on the yard; that he was buying and selling all the time, but he had the shed full and the yard full practically all the time"; that the agent of the insurance company told him, "We have covered Mr. Patton's lumber yard for your interest, as far as your interest appears, by loss clause."

We have set out this evidence in some detail, for this reason which is given in American Ins. Co. v. Meyers, 118 Ill. App. 484:

"The court will, if necessary, put itself in the place of the parties, and read the contract in the light of the circumstances surrounding them at the time it was made, and of the objects which they then evidently had in view. So, also, the acts of the parties themselves, indicative of their construction placed upon it, may be resorted to for the purpose of determining the true meaning of the written agreement. And in this regard it makes no differnece whether such acts are contemporaneous or subsequent."

It is perfectly clear that when this insurance was taken the parties understood it was to cover the green lumber in the open yard only. Patton so understood it

then, and so understood it after the fire, when he swore to the proof of loss on the National Union policy, and that, when the $3,500 National Union policy was reduced to $2,950.83 by the application and operation of the pro rata distribution clause, Patton and Leichhardt in some way construed that $549.17 loss to be a claim under the policy sued on which they refer to as "coinsurance," and that the idea of the appellee being responsible for this loss then first entered their minds and caused Patton to write the letter of October 29th, and caused the filing of this suit.

Ordinarily insurance contracts are construed against the insurers, but that is not true as to the location of the property insured. "The policy will not be extended to property not in the terms of the description in this respect." See 26 C. J. p. 93, sec. 93; Cooley on Ins. (2d Ed.) p. 4921; Couch's Cyclopedia of Insurance Law, sec. 963.

If the average reasonable man were told this company had lumber in its mill, had lumber on its open yard, and had insurance on the lumber on its yard, he would not for a moment think the lumber in the mill was insured.

The trial court reached this same result, but by different reasoning.

Judgment affirmed.